THE CUMBERLAND COAL AND IRON COMPANY, and
THE CONSOLIDATED COAL COMPANY vs. ANN PARISH.

*Trustee and Cestui que trust—Principal and Agent—Corpora-
tions—Transactions between a Corporation and its Directors
governed by the Rule applicable to transactions between Prin-
cipal and Agent, &c.—Burden of Proof as to a transaction
between Parties, where one bears a Fiduciary relation to the
other—An Assignee of a Mortgage stands in no different
position from that of his Assignor.*

As between trustee and *cestui que trust*, or agent and principal, the rule is
inflexible that the trustee or agent cannot take the benefit of a transaction
entered into in violation of his duty; or where the benefit claimed and the
duty to be performed, are inconsistent.

Directors and managers of corporations and other companies are within the
rule which governs the dealings of trustee and *cestui que trust*, and agent
and principal; such directors and managers are in fact trustees and agents
of the bodies represented by them.

In the case of directors of a corporation, there is an inherent obligation,
implied in the acceptance of such trust, not only that they will use their
best efforts to promote the interest of the shareholders, but that they will in
no manner use their positions to advance their individual interest as distin-
guished from that of the corporation, or acquire interests that may conflict
with the fair and proper discharge of their duty.

The burden of proof is upon a party holding a confidential or fiduciary rela-
tion to establish the perfect fairness, adequacy and equity, of a transaction
with the party with whom he holds such relation; and that too by proof
entirely independent of the instrument under which he may claim.

S. being a director of a company and also its financial agent, was one of three
trustees named in a deed of trust, executed by the company on the 30th of
September, 1857, and recorded, conveying certain of its property to secure
the claims of certain creditors, among which was scheduled one of S. for
the sum of $16,585.75. In 1871, P. sought to enforce a mortgage for
$15,000, upon part of the same property, executed to S. by the company

on the 23rd of September, 1857, but to which the affidavit of *bona fides* by the mortgagee was not made until May, 1861, and which was not recorded until June, 1861. This mortgage was assigned to P. by S. in October, 1863. The company alleged in defence that the indebtedness secured by the mortgage was the same as that secured by the deed of trust which had been paid. The evidence of S. and others, offered by P., to show that it was not the same debt being inconclusive, and it appearing that in the sworn answer of S. to a bill filed against him by the company in 1858, he had stated the sum of $434.90, to be the true balance due by him to the company upon a final adjustment of accounts, it was HELD:

That this mortgage could not be enforced against the company.

The assignee of a mortgage does not stand in the position of a purchaser without notice, as against the mortgagor and those claiming under him, notwithstanding the assignment may have been taken without notice of any defences against the enforcement of the mortgage.

Where an assignment of a mortgage is made by the mortgagee without the concurrence of the mortgagor, the assignee stands in no different position from that of his assignor.

APPEAL from the Circuit Court for Allegany County, in Equity.

The bill in this case was filed by the appellee on the 13th of January, 1871, to procure payment of a mortgage alleged to have been made by the Cumberland Coal and Iron Company to Allen M. Sherman, of certain real estate in Cumberland, to which the Consolidation Coal Company had become entitled by transfer from the Cumberland Coal and Iron Company. This mortgage came into possession of the appellee by assignment from Sherman, dated 6th October, 1863, and recorded 15th of October, 1863, the consideration thereof being recited as $21,000. The title of the Consolidation Coal Company accrued before this assignment. The further facts in the case, so far as necessary, will be found in the opinion of this Court. The Court below (MOTTER, J.,) passed a decree for the sale of the mortgaged premises, from which decree the defendants took this appeal.

The cause was argued before BARTOL, C. J., STEWART, GRASON, MILLER and ALVEY, J.

*John P. Poe* and *I. Nevett Steele*, for the appellants.

As to the burden of proof, ordinarily in the case of a bill filed to enforce a mortgage, the production of the mortgage, and proof of its execution and delivery by the mortgagor, create a sufficient *prima facie* case for the mortgagee. He may rest upon the recitals in the mortgage, and, in the absence of fraud or mistake, need offer no additional evidence of his claim—nor fear the admissibility of parol evidence to vary or contradict it.

If the mortgagor denies that the mortgage debt ever existed, his denial will not be considered effectual unless accompanied by allegations of fraud, accident or mistake in the execution and delivery of the mortgage, and, even if thus accompanied, the burden rests upon him to sustain by competent and sufficient proof these allegations. If he fails to meet this requirement, the mortgage will be upheld and enforced.

So, if he claims that the mortgage debt has been paid and satisfied, he must prove it to the satisfaction of the Court, and if his defence be that the mortgage itself was released, discharged or superseded by another instrument, he must, in like manner, affirmatively establish these defences.

Undoubtedly these are the general principles in ordinary mortgage cases, but their application to this case is the fundamental error of the Court below. The learned Judge proceeded upon the idea that it was incumbent upon the appellants to sustain the defences set up in their answer "by proof, clear, certain and entirely satisfactory to the Court;" that the production of the mortgage and the assignment was all that was required of the appellee, and that the mortgage, when produced, established *proprio vigore* alone the whole case of the appellee, until that case

was rebutted and clearly overthrown by the proof on behalf of the appellants.

This view of the Court, proper enough in an ordinary case, is wholly erroneous here. The mortgagee, Allen M. Sherman, at the date of the mortgage, was a prominent, active and influential director of the company. Moreover he was a controlling member of the executive committee of the company, by which all its affairs of every description were administered—its policy shaped and carried out—its debts contracted and paid—its assets managed, and its very existence attempted to be destroyed by a fraudulent combination, which has twice been condemned and annulled by this Court, upon the distinct grounds that his position as director and member of the executive committee disabled him from contracting for his own benefit with the company, whose affairs he controlled, and made all such contracts, if not absolutely void, at least *prima facie* fraudulent in law and in fact. 16*Md.*, 456; 20 *Md.*, 117.

During the whole time of these transactions he occupied towards the company a fiduciary relation of the most marked and distinctive character, and is, therefore, to be held to that degree of legal accountability which springs out of such relation. In asserting any pecuniary claims upon his *cestui que trust*, or its property which he had in his hands or under his control, he must especially come prepared to sustain his claim by a measure and amount of proof not demanded from parties differently situated.

The law upon this subject is now well settled, and nowhere more clearly than in Maryland. *Pairo vs. Vickery,* 37 *Md.*, 484, see also 16 *Md.*, 506; 20 *Md.*, 117, and the cases there cited.

Under these decisions the burden is upon Sherman to prove the validity and *bona fides* of the mortgage—the making of the alleged advances—the agreement to secure them by the mortgage, evidenced by some valid corporate act—the existence of this mortgage debt independently of

and in addition to the debt to him, specified in the schedule annexed to the deed of trust—the authority to the president and secretary to execute this mortgage, and, in a word, all the circumstances and conditions necessary to give the instrument complete validity ; and this, moreover, must be done by satisfactory evidence, *aliunde, the mortgage itself.*

The mortgage in such a case as this does.not prove itself and make a *prima facie* case for the trustee-mortgagee, but he must sustain its fairness and validity by competent and independent testimony.   To hold otherwise would necessarily render the principle which casts the burden of proof upon the mortgagee, practically of no value.    In the opinion of the Court below this controlling principle is altogether ignored.

Does the appellee stand in a better position than her assignor Sherman ?

The learned Judge below seems to lay some stress upon the supposed fact that she was a *bona fide* purchaser for value, and that as such she had higher rights than her brother-in-law, Sherman, the original mortgagee.   At most, the assignment being given only on account of an alleged pre-existing indebtedness, would not make the appellee a *bona fide* holder for value without notice.   *Ratcliffe vs. Sangston,* 18 *Md.,* 390, 391.   But if the appellee had in reality paid in cash the consideration of $21,000 as claimed, still her title would be precisely that of Sherman, neither more nor less.

If the alleged mortgage debt had really never existed, or if it had in fact been paid before the assignment, then the appellee, under her assignment, bought nothing but a fraudulent, or an extinguished *chose in action.*

The purchaser of a mortgage always buys subject to the equities between the original parties, no matter what consideration he gives, and his title depends upon the true state of facts between them.   The mortgagee whose rights

have been extinguished cannot transfer a better title than he has. The appellee's case therefore, is precisely that of Sherman's, whether she be or be not a *bona fide* purchaser for value. No principle is better established than this. *Jones vs. Hardesty*, 10 *G. & J.*, 420 ; *Coote on Mortgages*, 315-320 ; *Matthews vs. Wallwyn*, 4 *Vesey*, 118 ; *Chambers vs. Goldwin*, 9 *Vesey*, 264; *Schafer vs. Reilly*, 50 *New York*, 61 ; *Bush vs. Lathrop*, 22 *New York*, 535 ; 1 *Hilliard on Mortgages*, 571-582.

*S. A. Cox* and *William Walsh*, for the appellees.

Sherman was one of the directors at the date of the mortgage. But this did not disable him from lending needed money to the corporation, or disable the president and directors (he not acting in the matter) from borrowing the money and securing it. It is an every day matter for a director of a Company to make such loans, and take such securities. Some of the directors are often the largest stockholders and most interested in the success of the enterprise. There is no law forbidding the friends of the corporation to aid it with loans, and compelling it in its distress to seek relief from its enemies or strangers ; no law confiscating the money so loaned, and making the loan carry all the evidences of a crime. There is a very wide difference between the case of *one* of a numerous body of directors loaning money or securities to the Company, which it gets the benefit of, and the case where a sole trustee, with title and control of the property in himself, appropriates it all to pay himself the worthless debt of the insolvent husband, of his *féme covert cestui que trust*. Such a transaction as the latter shocks the bluntest sense of justice. The *cestui que trust* not *sui juris*—the whole property taken—no benefit to her. Such was 37 *Md.*, 467.

Surely this case is not like that. Can *one* director of a Company loan money to the corporation and receive security for it?

The Company has power to borrow money, and badly needs the money, and *one* of the ten or dozen directors has the money, and is willing to lend it to help the corporation, if he gets a mortgage security.

The president and a *majority* of the directors constitute the contracting and managing power of the corporation. The president is the whole of one integral part of the corporation. A *majority* of the directors form the other integral part.

The president and majority of the directors are in fact the corporation. The trust is not absorbed in one director. It is no fraud upon the corporation to loan it money. If the trustee, in 37 *Md.,* 467, had loaned needed money to his *cestui que trust,* a mortgage to secure it would have been good, and the property could not have been released without paying it. Where the benefit is conferred upon the *cestui que trust,* no law condemns it. *Bell, et al. vs. Webb,* 2 *Gill,* 170.

It is considered unnecessary to dwell upon the assignment of the mortgage to the appellee. Any equities growing out of the mortgage itself might be available against the assignee, but not set-off on other matters extraneous to the mortgage transaction itself.

[The arguments of counsel relating to the questions of proof of the mortgage debt, limitations and laches, and as to whether the Consolidation Company was a purchaser for value without notice, are omitted, those questions not having been passed upon by the Court.—REP.]

ALVEY, J., delivered the opinion of the Court.

It appears that at the time when the mortgage sought to be enforced was made, and for sometime previous, Sherman, the mortgagee, was not only one of the directors, but was a member of the executive committee; and also financial agent of the Company, the mortgagor. There is therefore no question as to the fact that Sherman bore an important fiduciary relation to the Company, as well as

one of trust and confidence in the general control and management of its affairs. Holding such relation, he was bound to exercise all the power and authority delegated to him, in conjunction with others, for the protection of the property, and the promotion of the best interest of the corporators, the stockholders, according to his skill and ability. As between trustee and *cestui que trust*, or agent and principal, the rule is inflexible, that the trustee or agent cannot be allowed to take the benefit of a transaction the entering into which was in violation of his duty, or where the benefit claimed and the duty required to be performed are in any respect inconsistent, the one with the other. The rule is founded on considerations of public policy, having in view the great difficulty, which must always exist in such cases, of obtaining clear and satisfactory evidence of the fairness of the transaction, and of the entire absence of all abuse or advantage taken of the confidence reposed in such trustee or agent. And it is now well settled that directors and managers of corporations, and other companies, are equally within the rule which guards and restrains the dealings and transactions between trustee and *cestui que trust*, and agent and his principal; such directors or managers being in fact trustees and agents of the bodies represented by them. *Attorney General vs. Wilson*, 1 *Cr. & Phill.*, 1; *Benson vs. Heathorn*, 1 *Y. & Coll. C. C.*, 326; *York & North Midland R. Co. vs. Hudson*, 16 *Beav.*, 485; *Aberdeen R. Co. vs. Blaikie*, 1 *Macq.*, 461; *Great Luxembourg R. Co. vs. Magnay*, 25 *Beav.*, 587; *Hoffman Steam Coal Co. vs. Cumbld. Coal & Iron Co.*, 16 *Md.*, 456, and same case in 20 *Md.*, 117.

The affairs of corporations are generally intrusted to the exclusive management and control of the board of directors; and there is an inherent obligation, implied in the acceptance of such trust, not only that they will use their best efforts to promote the interest of the shareholders, but that they will in no manner use their positions to advance

their own individual interest as distinguished from that of the corporation, or acquire interests that may conflict with the fair and proper discharge of their duty. The corporation is entitled to the supervision of all the directors, in respect to all the transactions in which it may be concerned; and if one of the directors is allowed to place himself in the position of having his conduct and accounts made the subject of supervision and scrutiny, he, of course, cannot act, in regard to those matters, both for himself and the corporation; and the consequence is, that the corporation is deprived of the benefit of his judgment and supervision in regard to matters in which such judgment and supervision might be most essential to its interest and protection. Not only this, the remaining directors are placed in the embarrassing and invidious position of having to pass upon, scrutinize and check the transactions and accounts of one of their own body, with whom they are associated on terms of equality in the general management of all the affairs of the corporation. The design of the rule, therefore, is to secure a faithful discharge of duty, and, at the same time, to close the door, as far as possible, against all temptation to do wrong, by subjecting the transactions between parties standing in such confidential relations, to the most exact and rigid scrutiny, whenever such transactions are brought in question before the Courts.

The transaction may not be *ipso facto* void, but it is not necessary to establish that there has been actual fraud or imposition practiced by the party holding the confidential or fiduciary relation;—the *ònus* of proof being upon him to establish the perfect fairness, adequacy, and equity of the transaction; and that too by proof entirely independent of the instrument under which he may claim. This is required, upon the general principle, "that he who bargains in a matter of advantage with a person, placing confidence in him, is bound to show that a reasonable use has been made of that confidence; a rule applying equally

to all persons standing in confidential relations with each other. If no such proof is established, Courts of Equity treat the case as one of constructive fraud." 1 *Sto. Eq. Juris.*, sec. 311, and also *secs.* 321, 322; *Pairo vs. Vickery,* 37 *Md* , 467.

Applying these general principles, and considering the case irrespective of the assignment of the mortgage to the appellee, the proof in the record falls far short of being sufficient to overcome the presumption against the validity of the mortgage, and of establishing affirmatively the perfect fairness, adequacy, and equity of the transactions upon which the mortgage professes to be based.

On the part of the appellee there were three witnesses examined; the appellee herself, Sherman, the mortgagee, and Loomis, the secretary and treasurer of the Cumberland Coal and Iron Company at the time the mortgage was made. The appellee does not profess to have any knowledge whatever of the original transactions between Sherman and the Company, and upon which the mortgage was based, nor of the circumstances under which the mortgage was executed. Her testimony is confined exclusively to the circumstances of the assignment of the mortgage on the 6th of October, 1863.

Sherman's testimony, while it relates to the consideration of the mortgage, and the circumstances under which it was executed, is of the most indefinite and inconclusive character. Many of the essentials to maintain the transaction he fails to prove; and of those in regard to which he does speak, he is by no means positive and certain.

The mortgage bears date the 23rd of September, 1857, and was acknowledged three days thereafter. It was signed by Mehaffey as president, and Loomis as secretary. The affidavit as to the *bona fides* of the consideration was not appended until the 3rd of May, 1861, and the mortgage was not filed for record until the 4th of June, 1861,—nearly four years after its execution. The

mortgage recites, that the mortgagee had theretofore, at the instance of the mortgagor, *at several times,* advanced different sums of money, and *on account of which advances* the sum of $15,000 then remained due to the mortgagee-; and it further recites, that it was contemplated that the mortgagee should become bound for the mortgagor, by the loan of his credit, for the use and accommodation of the Company, to the extent of $40,000 ; and that the advances were made, and the then existing liabilities incurred, on the express antecedent promise and agreement, that the Company would secure and indemnify the mortgagee by the execution of a mortgage, whenever the latter should require such security.

Four days after the acknowledgment of this mortgage, that is to say, on the 30th of September, 1857, the Company made to Sherman, the mortgagee, and to Mehaffey and Bloodgood, a deed of trust of all its property, except a particular portion thereof which had been previously conveyed in trust, but including that embraced in the mortgage, to secure the payment of its creditors, among whom was Sherman, to the amount of $16,585.75. This sum is shewn by the books of the Company to be the amount due Sherman at the date of the deed of trust, and it is the only sum or credit shewn by the books to be then due, and owing to him on *any* account ; and it is conceded that if that was the only sum due Sherman at the time, there is no mortgage debt due ; for the deed of trust superseded and took the place of the mortgage, as to Sherman's claim, and besides, all the debts intended to be secured by the deed of trust, have been settled and adjusted, including that shewn by the books to have been then due Sherman.

But it is contended by Sherman and his assignee, that the debt of $15,000, mentioned in the mortgage as due on account of advances previously made, was a separate and distinct indebtedness from that shewn by the books, and that the advances to the Company, making up the aggre-

gate of the mortgage debt, was never entered in the books of the Company, and hence the mortgage debt was not included in that secured by the deed of trust.

This, to say the least of it, is a little strange. Why take the mortgage for part and not the entire indebtedness? The amount on the books was in no manner secured, and there could have been no good reason for separating the indebtedness, and securing part and not the whole. The books of the Company show that there were regular accounts kept with Sherman, and that he was credited with advances made from time to time. Why the advances constituting the mortgage debt were not entered in the account, certainly requires full explanation. Sherman was a director, a member of the executive committee, and financial agent of the Company, and as such not only had access to the books, but it was his duty to inspect them, and to see that they were properly kept, and especially was it his duty to see that all proper entries were made in regard to transactions of his own with the Company.

He says, in his testimony, that at the time the mortgage was made the Company owed him the $15,000 for cash advanced; but whether advanced in one sum or not he cannot tell; and that he knows of no books, accounts, or documents, that would give information upon the subject. He cannot tell when the advances were made; he kept no memorandum or account whatever; he does not know how the money was paid the Company—whether by check, draft, or cash; he thinks, however, that all the money advanced by him, or nearly all of it, passed through the hands of Mr. Loomis, the secretary and treasurer of the Company, though the books disclose nothing in regard to it. In reply to the question, why the mortgage was made for the particular indebtedness, and at whose suggestion, he says he does not remember why it was made for the particular indebtedness; but, according to his best recollection, it was

made at the suggestion of the officers of the Company, to protect him for the daily loans that he was then making them. And in reply to the further question, whether the sum was made up of different loans, he says, he does not mean so to state; that his best impression; his strongest impression, is, that it was one loan. The mortgage, however, recites that the advances, making up the mortgage debt, were made at several times. The witness further states, in reply to the question, whether there was a resolution of the board of directors passed, authorizing the execution of the mortgage, that he *thinks* their counsel did direct a resolution, which was passed by the board, authorizing the execution of the mortgage, and directing the mode of acknowledgment; but there is no other evidence whatever that such resolution was ever passed. He does not know whether there was any written statement of the account furnished to the board of directors; the secretary of the Company kept the entire account, he, the witness, kept none.

This witness, in the evidence given by him, has failed to explain the circumstances of the loan or loans alleged to have been made by him to the Company. He does not show the occasion for the loan, nor how the money was used, nor whether for the exclusive benefit of the Company, though no person should be better able to explain these matters than himself. He does not pretend that the stockholders were cognizant of this particular transaction, nor has he even shown that all the directors were fully informed of it and gave their assent to it. No information in regard to it was imparted to any one by the books, and as the mortgage was withheld from record, there were no traces of the transaction, and no means of information, except the private knowledge of the parties immediately participating in it; and no explanation has been given for the great delay in perfecting and having the mortgage recorded, nor for the omission to have the proper entries

made in the books of the Company, from which the transaction could have been understood by those interested in the state and management of its affairs. Why these omissions, if the debt was real, and contracted for a proper purpose, and was in fact different and distinct from that evidenced by the books? If they were for private and secret reasons, as has been suggested, there could have been but one object in view, and that was to conceal the transaction, and to withhold information in regard to it from parties who might be entitled to know and understand the real condition of the affairs of the Company ; and to withhold information from parties entitled to receive it, would be of itself an act of bad faith, and in violation of duty.

But there is still another circumstance to be considered, as reflecting upon the question of the existence or non-existence of the mortgage debt, and though not of a conclusive character in itself, yet, when considered in connection with the other circumstances of this case, is entitled to weight, and that is the answer of Sherman to the bill filed by the Cumberland Coal and Iron Company against him and others in 1858, and which is the case reported in 16 *Md*, 456, and 20 *Md.*, 117. By that bill, the accounts between Sherman and the Company, as they appeared in the books, and which had been closed by adjustment, were sought to be opened, and surcharged and falsified, upon the allegation that there was a large amount still due the Company from Sherman upon proper and fair settlement. To this bill Sherman filed his answer, under oath, on the 18th of March, 1859,—long before the mortgage was placed on record,—and in that answer he stated that there had been a full and final settlement of accounts between himself and the Company, and he pleaded and relied upon an estoppel to the re-opening of the accounts. He stated that it was at his repeated requests that the executive committee of the Company entered upon the consideration of the subject, and took the accounts in hand to adjust and settle

them, and thereupon made up a statement, showing a balance against him of $434.90, and proposed the same as an allowance and compromise of all said matters of account between him, the respondent, and the complainants, and a full and final adjustment and settlement of the same. He further stated, that, *in order to make a final adjustment and closing up of all matters of account with the Company*, he did accept the proposition of the executive committee, and agreed to pay the $434.90, and the same was accepted and received by the Company in full satisfaction of such account. The mortgage was not set up in the answer as a subsisting claim, or as a separate and distinct debt from that in the books of the Company, and which had been adjusted and closed. If, as stated in the answer, all matters of account were finally adjusted and closed, without exception or reservation, it would be but a fair construction to conclude, that the advances secured by the mortgage were in fact those shewn upon the books, and that they were embraced in the final settlement. And this conclusion is fortified by the fact that it was nearly three years from the time of the settlement, and more than two years from the time of filing the answer, before the mortgage was perfected by the affidavit, and placed on file for record, notwithstanding the embarrassed and involved condition of the Company, and that the mortgage remained liable to be totally defeated by creditors. Such delay, under the circumstances, while not *per se* a ground of presumption against the claim, is yet entitled to weight when considered in connection with the other facts of the case.

The only other witness examined for the appellee is Loomis, and though examined at great length, he really proves nothing in support of the mortgage. He proves that he was in the employ of the Company from the time of its organization until the fall of 1858 or spring of 1859, in the capacity of secretary, and that he kept an account, called the "Sherman Loan account," which showed the

true state of accounts, debit and credit, between Sherman and the Company. He further proves that all the money of the Company passed through his hands as treasurer, and that he kept all the financial accounts, and that he entered in the books of the Company all sums of money received and paid out, during the time of his acting as treasurer, which was during the time of the transactions in question. He also states that Sherman's account was fully closed and discharged on the books, and that he could not find on the books any entry of the loans making up the mortgage debt, though he *thinks* that the sum of $15,000 was *bona fide* due Sherman at the date of the mortgage, consisting of sums loaned the Company *at different times;* and that the mortgage debt was separate and distinct from the debt secured by the deed of trust. But when pressed by a close cross-examination, as to the means of his information in regard to this latter fact, he admits that he has none other than the mortgage itself. He says that he has no other means of knowing that such a loan or loans was or were made, than the recitations or statements in the mortgage itself; and that his whole information on the subject is contained in the mortgage. He does not profess to have knowledge as to the transactions upon which the mortgage was founded, and such evidence as has been elicited from him can in no manner aid or support their fairness.

From what we have said it follows, that, as between the Company and Sherman, the case has not been made out in such manner as would justify the Court in granting relief at the instance of Sherman, the mortgagee; and the next question is, does the appellee, as assignee of the mortgage, stand in any better or more favorable position, as against the appellants, than the mortgagee himself, assuming the assignment to have been *bona fide* made?

In regard to this question there would seem to be no difficulty whatever. The assignee of a mortgage does not

stand in the position of a purchaser without notice, as against the mortgagor, and those claiming under him, notwithstanding the assignment may have been taken without notice of the defences against the enforcement of the mortgage. The transfer of a mortgage is so far within the rule which applies to other *choses in action,* that where the assignment is made without the concurrence of the mortgagor, as in this case, the assignee takes the mortgage, and the debt secured by it, upon the same terms, and subject to the like equities and defences that it was subject to in the hands of the assignor. The mortgagor cannot be prejudiced by the assignment; and the recording Acts make no difference in this respect. *Matthews vs. Wallwyn,* 4 *Ves.,* 118; *Williams vs. Sorrell, Ib.,* 389; *Chambers vs. Goldwin,* 9 *Ves.,* 254; *Clute vs. Robeson,* 2 *Johns.,* 595.

Without considering the several other questions raised by the appellants, it results from what we have said that the decree of the Court below must be reversed, and as there is no equity disclosed for any relief, the bill will be dismissed with costs.

*Decree reversed, and*
*bill dismissed.*

