ROSS TRANSPORT, INC., ET AL. *v.* CHARLES T. CROTHERS, ET AL.

[No. 61, October Term, 1945.]

574

*Decided January 9, 1946.*

The cause was argued before MARBURY, C. J., DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Enos S. Stockbridge,* with whom were *James W. Hughes* and *William J. Bratton* on the brief, for the appellants.

*Edward D. E. Rollins* and *Floyd J. Kintner* for the appellees.

MARBURY, C. J., delivered the opinion of the Court.

This is a derivative suit by a stockholder of a Maryland corporation, acting on his own behalf as well as for other stockholders who might join and be made parties, brought after demand had been made on the corporation

to institute such a proceeding, which demand was neglected and refused. The original plaintiff was Charles T. Crothers, and he was subsequently joined by another stockholder, his brother Edmund W. Crothers, who was made an additional party plaintiff by order of Court. The defendants (appellants here) are the corporation, Ross Transport, Inc., Wallace Williams, F. DuPont Thomson, James W. Hughes and William B. Ross, directors, and Elizabeth B. Williams, Lois Williams Young and Corrine Williams, stockholders. The purpose of the suit is to set aside the issuance of 40 shares of stock to Elizabeth B. Williams, 100 shares of stock to Corrine Williams, 100 shares of stock to Lois Williams Young and 125 shares of stock to William B. Ross. The defendants all answered, testimony was taken and the Court passed a decree granting the relief prayed, and directing the four stockholders named to repay to the corporation the dividends received by them on the stock declared to be illegally issued, and ordered cancelled. From this decree, all the defendants appealed.

It appears from the record that the corporation was organized on January 19, 1942, to operate a fleet of buses to transport employees of Triumph Explosives, Inc., to and from its plant at Elkton, Maryland. The incorporators were Wallace Williams, William B. Ross and Gervase R. Sinclair who later died. These three and F. DuPont Thomson and James W. Hughes were the directors. At the organization meeting of the directors, Williams was named as President and Ross as General Manager. The authorized stock was 5000 shares of no par value. At the organization meeting a resolution was passed authorizing the sale of this stock at $20 a share, and providing that stock to the value of $30,000 be offered for sale. This limited the stock to be issued to 1500 shares. The stock records of the company showed the original subscriptions to stock, all in March and April, 1942, to be as follows:

| | | | | |
|---|---|---|---|---|
| March 25th—To | Wallace Williams | 50 | shares |
| " | " Wallace Williams, Jr. | 100 | " |
| " | " Elizabeth B. Williams | 200 | " |
| " | " Edmund W. Crothers | 100 | " |
| " | " William B. Ross | 25 | " |
| " | " James W. Hughes | 150 | " |
| April  2nd | " F. DuPont Thomson | 150 | " |
| " | " Bessie F. Whitelaw | 10 | " |
| April 20th | " Charles T. Crothers | 50 | " |
| April 27th | " Gervase R. Sinclair | 50 | " |
| " | " Jean W. Sinclair | 150 | " |
| | Total | 1035 | |

In the latter part of July, 1942, after the death of Mr. Sinclair, Charles T. Crothers purchased the Sinclair stock, 200 shares, at $20 and 5% interest from the date of issuance. This did not, of course, increase the amount of stock outstanding. On August 26, 1942, the stock complained of was issued to the wife and daughters of Wallace Williams and to William B. Ross, totaling 365 shares in all, and increasing the outstanding stock to 1400 shares. All of this stock was issued at the set price of $20.00 a share. The stock issued to the Williams family was paid by Mr. Williams' check for $4800. Mr. Ross paid the company $2500 for his stock.

As a result of these purchases by Williams and Ross the stock books showed that the Williams family had 590 shares, Ross had 150 shares, Hughes had 150 shares, Thomson had 150 shares, Whitelaw had 10 shares, Edmund W. Crothers had 100 shares and Charles T. Crothers had 250 shares. Williams and Ross, therefore, had the controlling interest in the company. Mr. Williams testified that all of the stock in the company was sold by him personally under the directors' resolution. He said that all the stock in dispute was definitely promised in the beginning, except 40 shares to Mrs. Williams. This, he said, he put in to round out an even 1400 shares, holding back 100 shares which he thought Hughes or Thom-

son might like to take. He never called any other directors meeting to authorize any of the sales made after the original subscriptions and none of the other stockholders were given an opportunity to buy. He told Mr. Ross and Mr. Hughes how he was going to divide it. Mr. Ross did not testify.

The sale of this additional stock to a director and to the family of the president and director without any further authority than the original resolution, and without opportunity to buy given to other stockholders, is sought to be justified on the ground that it was originally planned, and that the money was needed to purchase additional buses at a cost of about $16,000. The facts, however, show no such need. The company was an immediate financial success. It was engaged in a special business, of which it had a monopoly, and in which it could not help making money so long as Triumph Explosives continued to operate its large plant, employing the workmen the Transport Corporation hauled. The loan of $3000 by Triumph Explosives, made in March, was paid in June. The record shows the following figures during the first five months of its existence:

|  | Surplus above liabilities and invested capital | Outstanding obligations on conditional sales contract | Cash Bank balance |
|---|---|---|---|
| April 25 | $ 8,459.77 | $50,372.22 | $ 9,092.65 |
| May 23 | 13,295.38 | 45,712.34 | 13,811.80 |
| June 21 | 20,214.53 | 42,144.63 | 14,154.62 |
| July 19 | 26,414.74 | 31,154.69 | 12,842.81 |
| Aug. 16 | 25,057.73 | 28,997.68 | 8,970.83 |

On August 7th, the directors authorized salary payments dating back to February 1, 1942, $3915 to Mr. Williams, $2875 to Mr. Ross and $2025 to Mr. Hughes who was Secretary and Treasurer of the company which had started business a few months before with a paid in capital of $20,700, and which had bought its operating equipment, i.e., the buses, on conditional sales con-

tracts, and had borrowed $3000 to pay for its licenses. Prosperity continued. On November 27, 1942, a dividend of $5 a share was declared. On December 17, 1942, one of $15 (called a return of capital, but not authorized by the stockholders, Code, Article 23, Sec. 32). On the same date, another dividend of $5 a share was declared payable June 30, 1943. The defendants, Williams and Ross, who were operating the company, knew on August 26, 1942, that they were about to receive large sums in dividends in addition to the salaries they were getting. The benefit of these dividends would not only increase the value of the stock, but the first two would pay back all the subscribers had invested, leaving any future earnings and distributions pure profit. Under these circumstances, they took the opportunity they thought they had to increase their investment, and in fact received in December the full amount they invested in August, leaving them with the additional stock on which to receive such further dividends as were obviously in sight.

The appellants contend that the company was not in the claimed good financial condition in August, because no allowance had been made for income and profits taxes. But if we reduce the book surplus of $25,000 on August 16, 1942, by allowing for a 40% tax (the limit unless the earnings increased), we still find the company with a net surplus of $15,000, 75% of the original investment. The stock had no "market value," but it must be obvious that it was worth much more than $20 a share on August 26th.

The appellees give two reasons for their contention that the stock sales of August 26th were void: First, because they deprive them and the other original stockholders of their pre-emptive rights to purchase a proportionate amount of the remaining shares, and, second, because, in selling to themselves and their nominees, Williams and Ross have abused their trust as officers and directors. They claim to be injured in two ways. Their voting powers have been proportionately lessened, and

the control of the company has passed to Williams and Ross. And the amount paid in dividends has to be divided among 365 more shares of stock to the consequent financial loss of the holders of the original shares.

Before discussing these legal questions, the outline of the case may be completed by quoting from the appellants' brief certain facts about the plaintiffs (appellees) which appellants claim are pertinent. The original plaintiff, Charles T. Crothers, was an employee of the corporation as well as a stockholder. Edmund W. Crothers had no position in the corporation, but he furnished it part of the buses that were bought at the inception of the business. The appellants' brief states:

"The 365 shares complained of were issued on August 26th, 1942. Charles T. Crothers learned of that fact two or three weeks thereafter; and his brother, Edmund W. Crothers learned about it three or four weeks after said Stock was issued. Charles T. Crothers understood from the first that the Sale of 1,500 Shares had been authorized; and no one had ever represented to him that no more than 1,035 Shares would be issued. In July, 1942, Charles T. Crothers refused to turn over half of the Sinclair Stock, then purchased by him, to Ross, and assigned for his reason the fact that Ross could buy more Stock from the Corporation; and he also attempted to buy the remaining 100 of the authorized 1,500 Shares for himself. On February 1st, 1943, at a Meeting of Stockholders, Charles T. Crothers was elected a Director and served for one year. At that Meeting the Treasurer's Report was accepted on a motion seconded by Edmund W. Crothers. At that Meeting of the Stockholders a Resolution was adopted, expressing to the Management and Employees the appreciation of the Stockholders for the manner in which the operation of the Corporation had been conducted during the previous year. The minutes show that Edmund W. Crothers seconded this Resolution. Charles T. Crothers was then present, and testified that he does not know whether he

voted for this Resolution, but he did not object to it. Edmund W. Crothers testified that he did not second the Resolution of Approbation and that he objected to the Minutes on the following year (after this suit was instituted by his brother, but before he, Edmund W. Crothers, had become a party thereto), and that he assigned as his reason for his protest that he was just reserving his decision. On September 13th, 1943, Charles T. Crothers, then a Director, seconded and voted for the Declaration of a Dividend on all 1,400 Shares of Stock. No protest was made to the Corporation about the issuance of the 365 Shares until a letter of protest was written by counsel for Charles T. Crothers on October 27th, 1943, which was after he had been 'fired,' to use his own words, by the Corporation, in October, 1943. Charles T. Crothers, by his own testimony, never made any objection to the 365 Shares complained of having been issued at any meeting of the Corporation."

Charles T. Crothers testified that he protested to Mr. Hughes and to Mr. Thompson shortly after he learned of the stock issues of August 26th. Mr. Hughes said he was told by Mr. Thompson in "the latter part of the summer, or the early summer of 1942" that Edmund Crothers had spoken to him about it. Edmund Crothers said he got in touch with Mr. Thomson when he learned of the transaction, and also talked to Mr. Hughes, and at one time had "quite a little argument" with Mr. Williams and the latter said "Wouldn't you do it, if you could get away with it." Charles Crothers gave as a reason for not bringing up the matter at a directors meeting "They were just a matter of form. Mr. Williams was the boss of the company. He owned the company."

The doctrine known as the pre-emptive right of shareholders is a judicial interpretation of general principles of corporation law. Existing stockholders are the owners of the business, and are entitled to have that ownership continued in the same proportion. Therefore, when additional stock is issued, those already having shares,

are held to have the first right to buy the new stock in proportion to their holdings. This doctrine was first promulgated in 1807 in the case of *Gray v. Portland Bank,* 3 Mass. 364, 3 Am. Dec. 156. At that time, corporations were small and closely held, much like the one before us in this case. But in the succeeding years, corporations grew and expanded. New capital was frequently required. New properties had to be acquired for which it was desirable to issue stock. Companies merged, and new stock in the consolidation was issued. Stock was issued for services. Different kinds of stock were authorized—preferred without voting power but with prior dividend rights—preferred with the right to convert into common—several classes of both common and preferred with different rights. Some stock had voting rights. Other stock did not. Bonds were issued, convertible into stock. All of these changes in the corporate structure made it impossible always to follow the simple doctrines earlier decided. Exceptions grew, and were noted in the decisions.

Only one of these exceptions is involved in the present case. It has been held that pre-emptive rights do not exist where the stock about to be issued is part of the original issue. This exception is based upon the fact that the original subscribers took their stock on the implied understanding that the incorporators could complete the sale of the remaining stock to obtain the capital thought necessary to start the business. But this gives rise to an exception to the exception, where conditions have changed since the original issue. The stock sold the Williams family and Ross was part of the original issue, and it is claimed by the appellants that it comes within the exception, and the appellees and the other stockholders have no pre-emptive rights. *Balto. Ry. Co. v. Hambleton,* 77 Md. 341, 26 A. 279; *Real Estate Trust Co. v. Bird,* 90 Md. 229, 44 A. 1048; *Thom v. Baltimore Trust Co.,* 158 Md. 352, 148 A. 234; *Yasik v. Wachtel,* Del. Ch., 17 A. 2d 309; 40 Mich. L. Rev. 115. The appellees, on

the other hand, contend, and the chancellors found, that changed conditions made it unnecessary to use the remaining unsold stock to obtain capital, and pre-emptive rights exist in it just as they would exist in newly authorized stock. *Hammer v. Werner*, 239 App. Div. 38, 265, N. Y. S. 172, *Dunlay v. Avenue etc. Co.*, 253 N. Y. 274, 170 N. E. 917, 43 Harvard L. Rev. 586, 602-603.

It is unnecessary for us to decide which of these two conflicting points of view applies to this case, because another controlling consideration enters. The doctrine of pre-emptive right is not affected by the identity of the purchasers of the issued stock. What it is concerned with is who did not get it. But when officers and directors sell to themselves, and thereby gain an advantage, both in value and in voting power, another situation arises, which it does not require the assertion of a pre-emptive right to deal with.

It has long been the law in this State that trustees cannot purchase at their own sale, and trustees, in this sense, include directors of corporations. This principle of the law was discussed by Chief Judge LeGrand in the first of the cases involving the dealings of Sherman with the Cumberland Coal and Iron Company (*Hoffman Coal Company v. Cumberland C. & I. Co.*, 16 Md. 456 at pages 507-508, 77 Am. Dec. 311). This case referred to the earlier case of *Richardson v. Jones*, 3 Gill & J. 163, 22 Am. Dec. 293. As authority for the general policy of the law forbidding a trustee to become a purchaser, either directly or indirectly, at his own sale, and stating, "if he does, such sale may, and will be set aside, on the proper and reasonable application of the parties interested." The same statement is repeated in the second Sherman case, *Cumberland C. & I. Co. v. Sherman*, 20 Md. 117, pages 133, 134. This would lead to the conclusion that such a transaction is entirely voidable at the option of a party interested. In the third case involving the same company, *Cumberland Coal and Iron Co. v. Parish*, 42 Md. 598, Judge Alvey, speaking for this Court said: "The

affairs of corporations are generally intrusted to the exclusive management and control of the board of directors; and there is an inherent obligation, implied in the acceptance of such trust, not only that they will use their best efforts to promote the interest of the shareholders, but that they will in no manner use their positions to advance their own individual interest as distinguished from that of the corporation, or acquire interests that may conflict with the fair and proper discharge of their duty." After some other observations on the subject, the opinion then states: "The transaction may not be *ipso facto* void, but it is not necessary to establish that there has been actual fraud or imposition practiced by the party holding the confidential or fiduciary relation;—the onus of proof being upon him to establish the perfect fairness, adequacy, and equity of the transaction; and that too by proof entirely independent of the instrument under which he may claim." This last quotation indicates that such a transaction is not absolutely voided at the option of the interested parties, but shifts the burden of proof upon the directors to establish its fairness. This last view was again stated by Judge Alvey in the case of *Booth v. Robinson*, 55 Md. 419, at pages 441-442, and his words in the last case are quoted by this Court in the case of *Penn. R. Co. v. Minis*, 120 Md. 461, at page 486, 87 A. 1062. See also *Macgill v. Macgill*, 135 Md. 384 and cases cited on page 394, 109 A. 72. *Coffman v. Publishing Co.*, 167 Md. 275, 173 A. 248, and *Williams v. Messick*, 177 Md. 605, 11 A. 2d 472.

It is not necessary for us to determine in this case whether the sale of stock to the Williams family and Ross is voidable merely upon the application of some of the other stockholders, or whether proof of such sale merely makes it necessary for these appellants to show the complete equity of the transaction. If we take the latter view, which is that most favorable to these appellants, we must hold that the burden placed upon the two directors has not been met. They have not shown that

the company needed the money so badly and was in such a financial condition that the sale of the additional stock to themselves was the only way the money could be obtained. On the contrary, the corporation appears to have been in a very good financial condition. It is probable that any necessary financing of any buses could easily have been arranged through some financial institution, and Williams and Ross benefited greatly by their action in selling the stock to themselves. Nor is there any corroboration of Williams' statement that it was all arranged in the beginning, who was to get this additional stock. None of the other incorporators or directors were called to testify about this, and Ross himself, as we have noted, did not testify at all. We conclude, therefore, that the sale must be set aside as a constructive fraud upon the other stockholders.

The further questions of laches, waiver and ratification, raised by the appellants, have little merit. The suit is brought within the statutory period of limitations and neither of the appellees, in our opinion, are estopped by any of their actions from making the claim, nor can such actions be construed as a waiver of their rights. The situation of the appellants has not been changed by any action of the appellees, and the mere fact that Edmund W. Crothers voted for a resolution of approbation of the operation of the corporation (if he did so vote) does not imply a waiver of his rights in respect to the stock transaction or a ratification of it. Charles T. Crothers, more than a year after the stock transaction, as a director, voted for a declaration of a dividend on all 1400 shares of stock which included the issue of August 26, 1942. This was an ordinary dividend resolution and could hardly be held to be a ratification of the issuance of any particular share of stock. The question of ratification by resolution of stockholders after an explanation of a transaction was considered in both Sherman cases, *supra,* 16 Md. 456 and 20 Md. 117. Especially in the last one. In those cases the resolution was definite in approving

the sale attacked. Yet the Court held that such a resolution did not ratify it, because certain necessary considerations were absent. These considerations are thus stated: "At the time of the supposed ratification, the principal must have been *fully* aware of every material circumstance of the transaction, the real value of the subject of the contract and his act of ratification must have been an independent and substantive act founded on complete information and of perfect freedom of volition. And in addition to all this, the *cestui que trust* must not only have been acquainted with the facts, *but apprised of the law, how those facts would be dealt with if brought before a Court of Equity.*" (Italics are the Court's.) Repeated 20 Md. 139.

The decree will be affirmed.

*Decree affirmed with costs.*