**Pamela DICKSON, Individually and derivatively on behalf of Schmidt Baking Company, Inc., Plaintiff,**

v.

**C. Peter SMITH, et al., Defendants.**

No. Civ.A. JFM–98–62.

United States District Court,
D. Maryland.

Aug. 20, 1998.

**560**

Marc Seldin Rosen, Scanlan & Rose, Baltimore, MD, George F. Ritchie, IV, Piper & Marbury, Baltimore, MD, for Plaintiff.

Michael John Collins, Thomas & Libowitz, Baltimore, MD, Andrew Gendron, Goodell, DeVries, Leech & Gray, Baltimore, MD, for Defendants.

## OPINION

MOTZ, Chief Judge.

Plaintiff, Pamela Dickson, has brought suit individually and derivatively on behalf of Schmidt Baking Company, Inc. ("Schmidt"), against defendants C. Peter Smith, Sr. ("Smith"), C. Peter Smith, Jr. ("Smith Jr.") and Leonard V. Bunce (collectively "the Smith defendants"), John Morrison, John Stewart, Robert Filippi, Joseph Stanley, Hilary Klug and Richard Koester (collectively "the executive defendants"), and Schmidt. The first count of the complaint alleges that Dickson's preemptive rights were violated by a stock option plan offered to certain corporate officers that denied her an opportunity to purchase a percentage of the newly-issued stock. The defendants named in count one are Schmidt, the Smith defendants, and Morrison, Stewart, and Filippi. The second two counts of the complaint, brought derivatively on Schmidt's behalf, allege that all the individual defendants breached their fiduciary duties of loyalty and care by approving the stock option plan and "golden parachute" agreements for the executives.

Dickson has moved for summary judgment on the preemptive rights claim stated in count I. All of the defendants have filed cross-motions for summary judgment on the preemptive rights claim, and, in addition, the executive defendants have filed a cross motion for summary judgment on counts two and three. Dickson's motion for partial summary judgment will be granted, and the cross-motions for summary judgment will be denied on all counts.

### I.

Pamela Dickson is a shareholder of Schmidt, a closely-held family-owned company incorporated in Maryland. The stockholders of Schmidt, prior to the issuance of the stock option plan, could be generally broken into three groups based upon the families that controlled the stock: the "Bowyer shares," of which Dickson is a member; the "Smith shares," which were owned or otherwise controlled by Smith, the CEO of Schmidt, and his sister, Susan Smith House; and the "Obrecht Trust shares."[1] Through late 1997, the Bowyer shareholders collectively owned 40.63% of Schmidt stock, Smith and his sister controlled of 42.82% of the stock, and the Obrecht Trust shareholders owned the remainder, about 16.55%. Until January 1, 1998, Smith also controlled the

---

**1.** The stock "controlled" by Smith includes the shares he owns personally and the shares owned by three trusts for which he serves as trustee.

Obrecht Trust shares pursuant to a Voting Trust agreement. This provided him (together with his sister) with control over almost 60% of the shares. On January 1, 1998, the Voting Trust agreement ended, and control of the Obrecht Trust shares returned to the Obrecht Trust shareholders.

During 1997, the Bowyer shareholders and Obrecht Trust shareholders had discussed selling their interests in Schmidt following the expiration of the Voting Trust. In total, those interests would comprise a majority of the Schmidt stock. They approached Smith about their plan to sell, but he stated that he was not interested in selling Schmidt generally or his minority interest specifically. In November and December 1997, prior to the expiration of the Voting Trust, Schmidt's board of directors, consisting of Smith, his son C. Peter Smith, Jr., and Leonard Bunce, approved a stock option plan. The stock options, which were awarded to Smith and Morrison, Stewart and Filippi, totaled 8,375 shares, and allowed the officers to exercise the options for $138.00 per share. An independent accounting firm, Watkins, Meegan, Drury & Co., LLC ("Watkins, Meegan"), had valued the shares at that price. Dickson claims, and the evidence is virtually undisputed, that the issuance of those stock options took place to allow Smith, and the management team he had installed, to retain control of the company following the termination of the Voting Trust and to prevent the Bowyer and Obrecht Trust shareholders from selling Schmidt.[2] She alleges that she (like other stockholders) suffered individual harm because she was deprived of her preemptive rights to purchase new stock to maintain her overall percentage share of Schmidt's stock

(approximately 1.37%).[3] In addition, she alleges that Schmidt was harmed because, at the same time the board approved the stock option plan, it also approved "golden parachute agreements" for various executives, providing significant severance benefits if their employment should be terminated, that were not in the corporation's interest but designed and intended to prevent the sale of the corporation to a third party.

The board submitted neither the stock option plan nor the employment agreements to a shareholder vote, and did not inform the shareholders of the actions. As a result of the stock option plan, Smith now controls approximately 45.6% of the outstanding Schmidt stock, his sister owns 4.7% of the stock, and the other directors who were part of the stock option plan now control 6% of the stock. The Bowyer and Obrecht Trust shareholders were not offered the opportunity to maintain their proportionate interest in Schmidt.

## II.

■ Prior to 1995, when statutory amendments were enacted that dramatically affected the preemptive rights of shareholders in corporations incorporated after the date of enactment, under Maryland law existing shareholders, as "the owners of the business, ... [were] entitled to have that ownership continued in the same proportion. Therefore, when additional stock ... [was] issued, those already having shares, ... [were] held to have the first right to buy the new stock in proportion to their holdings." *Ross Transp., Inc. v. Crothers*, 185 Md. 573, 45 A.2d 267,

---

**2.** Although defendants' motives in issuing the stock are not material to the issues presented, fairness to them requires that the factual context for their actions be briefly stated. In the early 1990s, under the leadership of Thomas and Charles Bowyer, Schmidt had suffered unprecedented losses and had been forced to stop paying dividends to its shareholders. As a result, a co-trustee of the Obrecht Trust entered a Voting Trust Agreement with Smith to allow him to take control of the company. Smith, and the management team he hired, returned Schmidt to the black and made its financial status secure. As a result, when at the expiration of the Voting Trust Agreement the Bowyer and Obrecht shareholders threatened to force a sale of Schmidt by selling

their (combined) majority shares, the Board of Directors offered the stock options to Smith and the key management personnel in order to keep the well-functioning group together and to give them greater incentive to perform well.

**3.** Dickson further claims, on behalf of the corporation, that Schmidt suffered harm from the directors' breach of their fiduciary duties of loyalty and care because it only received $1,155,750 for the stock. She claims that Watkins, Meegan substantially undervalued the stock, which should have received a much higher price per share. I need not decide the validity of this claim on the present motions.

270 (1946). A corporation's charter could, however, provide for the "definition, limitation, or denial" of stockholders' preemptive rights. *See* Md.Code Ann., Corps. & Ass'ns Art., § 2–105(10) (1993).[4] Moreover, common-law exceptions to the doctrine of preemptive rights developed over the years, and these exceptions were codified as follows:

(a) *Circumstances in which preemptive rights do not accrue.*—Unless the charter provides otherwise, a stockholder does not have any preemptive rights with respect to:

(1) Stock issued to obtain any of the capital required to initiate the corporate enterprise;

(2) Stock issued for at least its fair value in exchange for consideration other than money;

(3) Stock remaining unsubscribed for after being offered to shareholders;

(4) Treasury stock sold for at least its fair value;

(5) Stock issued or issuable under articles of merger;

(6) Stock which is not presently entitled to be voted in the election of directors issued for at least its fair value;

(7) Stock, including treasury stock, issued to an officer or other employee of the corporation or its subsidiary on terms and conditions approved by the stockholders by the affirmative vote of two thirds of all the votes entitled to be cast on the matter; and

(8) Any other issuance of shares if the applicability of preemptive rights is impracticable.

Md.Code Ann., Corps. & Ass'ns Art., § 2–205(a)(1993).

Dickson contends that, because none of those eight exceptions applied, her preemptive rights accrued. As a result, she argues, the defendants violated her preemptive rights by failing to offer her the opportunity to maintain the ratio of her proportionate interest and voting power in Schmidt. In response, defendants argue that (1) Schmidt's charter negated Dickson's preemptive rights, and (2) assuming it did not, the exceptions to the accrual of preemptive rights contained in subparagraphs 2–205(a)(7) and 2–205(a)(8) apply.

## A.

■ The seventh article of Schmidt's corporate charter provides that "the board of directors of this corporation is ... empowered to authorize the issuance from time to time of the remaining shares of the common stock of this corporation without par value for such consideration as the said board may [deem] advisable."[5] Defendants contend that this language "negatives by implication" the accrual of preemptive rights. In support of this contention, defendants rely upon a law review article published in 1928 in which Professor Morawetz, a recognized authority in the field of corporate law, opined that preemptive rights are "negatived by implication ... if ... a valid by-law adopted by the shareholders confers upon the directors power ... to sell additional shares from time to time for money in the ordinary course of the business of the corporation and the additional shares are issued in the exercise of this power." V. Morawetz, *The Preemptive Rights of Shareholders*, 42 Harv.L.Rev. 186, 196–97 (1928).[6] I have substantial question whether Professor Morawetz would have considered an issuance of stock, such as the

---

4. Section 2–105 and other statutes cited in this opinion were amended as part of the 1995 statutory changes. The citations are to the old sections.

5. The word between "may" and "advisable" in this sentence is illegible in the charter, but the parties agree that in all likelihood the word is "deem" as indicated within the brackets in the text.

6. Defendants also rely upon § 6.24 of the Model Business Corporation Act ("MBCA") that authorizes a board of directors to "determine the terms upon which the rights, options, or warrants [for the purchase of stock] are issued...." This reliance seems somewhat inexplicable since the MBCA adopts an "opt-in" approach to preemptive rights. Although this approach may be more "modern" and suited to present-day stock option and incentive plans, it was directly contrary to the "opt-out" approach to preemptive rights followed by Maryland law until the 1995 statutory amendments.

one involved in this case, that has a purpose of altering the balance of power among the stockholders, to be "in the ordinary course of business." Elsewhere in his article he observed that "it is a breach of duty on the part of directors to issue additional shares or to sell treasury shares, not to benefit the shareholders, but to benefit themselves, or to enable particular shareholders or others to acquire voting control of the corporation, or to enable them to acquire shares at less than their value." *Id.* at 188.

In any event, I do not construe § 2–105(1) as authorizing preemptive rights to be "negatived by implication." Prior to the 1995 statutory changes, the doctrine of preemptive rights was firmly embedded in Maryland law. In *Real–Estate Trust Co. v. Bird*, 90 Md. 229, 44 A. 1048, 1049–50 (1899), the Maryland Court of Appeals held that "[t]here can be no doubt that the general rule is that when the capital stock of a corporation is increased by the issue of new shares, authorized by the charter, the holders of the original stock are entitled to the new stock in the proportion that the number of shares held by them bears to the whole number before the increase." In *Miles v. Safe Deposit & Trust Co.*, 259 U.S. 247, 252, 42 S.Ct. 483, 66 L.Ed. 923 (1922), the Supreme Court of the United States, in a case that arose in Maryland, stated that the doctrine that preemptive rights are "an equity that inheres in stock ownership . . . recognized so universally as to become axiomatic in American corporation law." At common law, preemptive rights existed independently of the corporate charter, and the failure of the charter to maintain them did not affect their validity or existence. *See Thom v. Baltimore Trust Co.*, 158 Md. 352, 148 A. 234, 235 (1930).

It is against this background that § 2–105(10) must be read. Absent an express charter provision to the contrary, a shareholder would (until the 1995 statutory changes) have reasonably expected that her preemptive rights, strongly protected by common law, were fully enforceable. The seventh article of Schmidt's charter, upon

which defendants rely, clearly was not such a provision. All that it did was to empower the board of directors to issue stock. That power could comfortably co-exist with, and be subject to, the independent common-law requirement that the board honor the preemptive rights of existing shareholders when exercising its authority to issue stock. Thus, article seven of the charter was not a "definition, limitation, or denial of the preemptive rights of stockholders" within the meaning of § 2–105(10).

### B.

Defendants also argue that § 2–205(a)(7) excepts the stock that the defendant directors issued to Smith, Morrison, Stewart and Filippi from the accrual of preemptive rights.[7] That section provides that preemptive rights do not attach to "[s]tock, including treasury stock, issued to an officer or other employee of the corporation . . . on terms and conditions approved by the stockholders by the affirmative vote of two thirds of the votes entitled to be cast on the matter." Again referring to article seven of Schmidt's charter, defendants assert that whether or not that article itself "negatives by implication" preemptive rights, unquestionably it transfers from the stockholders to the board of directors the power to authorize the issuance of stock. Thus, defendants argue, none of the stockholders had "votes entitled to be cast on the matter" of the issuance of the stock, and their stock therefore could be issued without any stockholder approval at all.

If all that were involved were a word game, it could be argued with at least equal plausibility that defendants' argument fails because § 2–205(a)(7) applies only where the stock is issued "on terms and conditions approved by the stockholders." Thus, since article seven of Schmidt's charter divests stockholders of any authority to set the terms and conditions for the issuance of stock, § 2–205(a)(7) is not applicable. There is, however, a more principled answer. The proper governance of a corporation (both

---

**7.** In their reply memorandum, defendants foreswore reliance upon § 2–205(a)(7). However, during oral argument they seemed to making the contention I here summarize, and I will therefore address it.

legally and operationally) requires maintaining the appropriate balance between directors and shareholders. As a general rule, directors must be protected from the attempted micromanagement of corporate affairs by non-director stockholders. At the same time, as a general rule, non-director stockholders require protection from directors who would use their authority to favor themselves in corporate matters. There is no greater potential for abuse than the authority to change the fundamental balance of power within a corporation by issuing new stock to directors and officers that gives them the opportunity to exercise permanent control.

Protection against this potential abuse is provided by the super-majority requirement imposed by the General Assembly in § 2–205(a)(7). Under that section not only two-thirds of all votes cast, but two-thirds of all votes entitled to be cast is required for the issuance of stock to directors and officers. The same requirement is required for other major corporate actions, such as the amendment of the charter, consolidations and mergers, and dissolution. *See* Md.Code Ann., Corps. & Ass'ns Art., §§ 2–604(d); 3–105(d); 3–403(d). This fact emphasizes the importance that the General Assembly properly has attributed to curtailing the power of directors to issue stock to themselves and to other members of existing management. It also reveals the fallacy in defendants' suggestion that the super-majority requirement of § 2–205(a)(7) can be circumvented by contending that a standard charter provision (like article seven of the Schmidt charter)— which simply authorizes the board of directors to issue stock—should be read as disenfranchising common stockholders on such a critical question of corporate governance. Properly read in statutory context, the phrase "votes entitled to be cast" refers to the nature of voting rights inherent in the stock itself. Here, no contention is made that the common stock owned by the Boyer shareholders and the Obrecht Trust shareholders was restricted in any way, and, under § 2–205(a)(7), no stock could be issued to defendants unless enough other shareholders joined with Smith to approve the issuance by a two-thirds majority.

## C.

■ Defendants' third contention is that honoring the preemptive rights of the non-director shareholders would have been "impracticable" within the meaning of § 2–205(a)(8) since the purpose of issuing the stock was "to retain and reward key management personnel." The outer contours of the impracticability exception to the preemptive rights doctrine are difficult to define. However, there is no need for me to attempt to define them here because two considerations (related but independent) lead me to the conclusion that defendants' reliance upon the impracticability exception is unsupportable.

First, for the reasons just stated, I am of the view that § 2–205(a)(7) requires a two-thirds approval of all holders of unrestricted common stock for the issuance of stock to directors and officer for preemptive rights not to accrue. Defendants argue that there is no provision in § 2–205(a) affirmatively stating that an issuance of stock to directors and officers that is unlawful under § 2–205(a)(7) cannot be authorized under § 2–205(a)(8). Although that is true, the very facts of this case demonstrate the fallacy of their position. If defendants were correct, then in order to defeat preemptive rights a corporation's directors would merely have to show that they and other members of their management team were performing their duties well. Like defendants here, they would assert that it is in the corporate interest that they be given an incentive to remain in their positions and that they must be compensated with stock to assure the longevity of their tenure. In my judgment, the General Assembly never contemplated that preemptive rights could be negated so easily. The absence of a provision affirmatively stating that stock can be issued to directors and officers only to the extent authorized by § 2–205(7), i.e., only with two-thirds approval of stockholders with general voting rights, is fully explained by the likelihood that the General Assembly did not believe it was necessary to belabor the obvious.

Second, whatever the farthest reaches of the impracticability exception may be, surely

the exception does not countenance the implementation of a plan that has the direct effect (and barely disguised intent) of undermining the very purpose of the preemptive rights doctrine. If defendants were to prevail, they would have accomplished their end of substantially reconfiguring the balance of power within Schmidt by increasing the proportion of their own stock ownership at the expense of the Bowyer and Obrecht Trust shareholders. Their avowed purpose is to prevent the other shareholders from having the power to remove them from office. Defendants seek to blunt the impact of their plan by arguing that Smith has not acquired control over the corporation since he must continue to perform sufficiently well to retain the support of his sister and the other officers to whom stock has been issued. This argument is little more than a quibble. It is indisputable that Smith and his colleagues on the Schmidt management team now have far greater power than they did before to control the destiny of the corporation. They obtained that power by diluting the power of the Bowyer and Obrecht Trust shareholders and, in doing so, demonstrated an utter disregard for the doctrine of preemptive rights. That they may have genuinely believed that they were acting in the interest of Schmidt and all of its shareholders is beside the point. Good motives do not justify unauthorized conduct.

### III.

Defendants Morrison, Stewart, and Filippi make an ancillary argument that, assuming the issuance of stock by the directors violated the preemptive rights of plaintiff and the other non-director shareholders, nevertheless the issuance of stock to them should not be rescinded because they were not the directors who issued the stock, they paid fair value for it, and there is no equitable reason to take from them what they have purchased. Under other circumstances their argument might be persuasive. Here, however, there can be no question that Morrison, Stewart, and Filippi knew all of the pertinent facts, including the reason stock was being issued to them: to prevent the Bowyer and Obrecht Trust shareholders from being able to sell Schmidt if they chose to do so upon the expiration of the Voting Trust and thus to preserve their own positions (and the positions of the other individual defendants) as members of the management team.

It has been established for almost a century or more that where persons having management authority over a company obtained stock through an unlawful sale, a court may set aside the transaction. *See, e.g., Glenn v. Kittanning Brewing Co.*, 259 Pa. 510, 103 A. 340, 342 (1918). The court's power need not be exercised where equitable considerations favor a remedy other than rescission. *See, e.g., Barsan v. Pioneer Savings & Loan Co.*, 163 Ohio St. 424, 127 N.E.2d 614 (1955). Such considerations do not, however, exist here, and the issuance of stock to defendants Morrison, Stewart, and Filippi will be set aside.

### IV.

Since I am ruling in favor of Dickson as to count I, it follows that the executive defendants' motion for summary judgment as to the claims in counts II and III relating to the stock issuance must be denied. There remains for decision only the executive defendants' motion for summary judgment as to the claims in counts II and III relating to the "golden parachute" agreements. Clearly, genuine issues of material fact exist as to those claims. The estimated value of the "golden parachute" agreements challenged by Dickson approaches, if not exceeds, Schmidt's net worth. A fact-finder may well conclude from the context in which the agreements were made that their purpose was to prevent the Bowyer and Obrecht Trust shareholders from being able to sell Schmidt to a third party, even if they were able to prevail on their preemptive rights claim (as they have done in this court), since no potential buyer would purchase a corporation whose assets would be entirely consumed in paying off the existing management team as soon as the sale was effected. If this was the purpose, defendants breached their fiduciary duties in devising and entering into the agreements.

A separate order effecting the rulings made in this opinion is being entered herewith.

### ORDER

For the reasons stated in the memorandum entered herewith, it is, this 20th day of August 1998

ORDERED that

1. Plaintiff Pamela Dickson's motion for partial summary judgment is granted;

2. Defendants' cross-motions for summary judgment are denied; and

3. The 1997 issuance of stock to C. Peter Smith, Sr., John Morrison, John Stewart and Robert Filippi is declared to be in violation of plaintiffs preemptive rights, and the actions of the board resulting in the issuance of said stock are hereby rescinded.