## PATTERSON PARK PERMANENT BUILDING UNION NO. 3 OF BALTIMORE CITY v. CHARLES G. JUENGST.

*Building and Loan Association—Withdrawal by Member—
Notice—Outside Payment of Dues—Authority
of Officer.*

A stockholder or member of a building and loan association need not give the notice of withdrawal required by its by-laws, if this would under the circumstances manifestly be futile, as when the association denies that it owes him, either as member, stockholder, or creditor, more than a small part of what he claims.                                                           p. 41

That the by-laws of the association provided for a weekly meeting, and the receipt of dues at such meeting, did not render invalid payments of dues at other times and places, if made in accordance with a practice long countenanced and acquiesced in by the association.                                          pp. 41, 43

In an action against a building and loan association by a member to recover deposits, made by him by payments to defendant's secretary at plaintiff's place of business, *held* that there was evidence to go to the jury that the practice of making outside collections by the secretary had been recognized and acquiesced in by the association, and that in so making such collections the secretary was the association's agent.        p. 43

*Decided March 24th, 1927.*

Appeal from the Baltimore City Court (SOLTER, J.).

Action by Charles G. Juengst against the Patterson Park Permanent Building Union No. 3 of Baltimore City. From a judgment for plaintiff, defendant appeals. Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Richard S. Culbreth,* with whom was *Henry M. Nitzel* on the brief, for the appellant.

*William H. Lawrence* and *Joseph T. Molz,* for the appellee.

SLOAN, J., delivered the opinion of the Court.

This is an appeal from a judgment of the Baltimore City Court in a case wherein the appellee sued the appellant, a building and loan association, for money had and received as deposits made by the appellee from June 1st, 1921, to February 20th, 1924. The appellee filed with the declaration an open account, which was a copy of the items in his pass book entered therein by the secretary of the association, showing deposits amounting to $5,235.51 and credit for dividends amounting to $864.92, with charges of three dividends of $167.85 each drawn by the appellee, leaving a balance of $5,596.88, the amount of the verdict. The ledger account of the association shows six credits for dues from June 22nd, 1921, to March 19th, 1924, amounting to $933.83, credit for eight dividends from March 29th, 1922, to September 21st, 1925, amounting to $226.30, or a total of $1,160.13, and charges of cash withdrawn of $703.58, leaving a balance of $456.58. The affidavit of defense admitted $456.58 "of the plaintiff's claim to be due and owing."

It appears that on June 1st, 1921, the appellee subscribed through the secretary of the association, Hellman, for twenty shares of stock of the par value of $100 each. All the payments were made by the appellee at his place of business to Hellman, who would take the pass book and money, and later return the book with the payments duly credited thereon to the appellee. This continued until February 20th, 1924, when the last payment was made, up to which time the actual amount of cash paid by the appellee was $5,235.51. The appellee never made any payments at the office of the association, and the only times he went to the association were to get credit for or draw his dividends, and on all those occasions Hellman, the secretary, except on the last visit, on or

about December 15th, 1925, was the officer who received and handled the appellee's book. There is no evidence that any other officer had his hands on it until December, 1925, when the misconduct of the secretary was discovered, and it might not have occurred then if the secretary had not been absent. As long as he could get his hands on the pass book, and the demands of the member did not exceed the credit on the association ledger, there was little danger of discovery. The secretary, according to the by-laws, "shall collect dues, fines and charges of the members, keep correct accounts of all receipts and disbursements, and keep accurate account with stockholders. He shall have in charge all books and papers belonging to the union. * * * He shall also give a semi-annual report of the whole working of the union; said reports to be examined by a committee of three appointed for that purpose." By section 5, "The treasurer shall receive all money from the secretary that is paid into the union. * * * He shall pay all orders drawn upon him by order of the board of directors, if such order be signed by the president and attested by the secretary." The contact of the member or stockholder with the association was through the secretary, and any examination of the books of the association depended for its accuracy upon the honesty of the secretary. The facts here show that the secretary misappropriated and embezzled about five thousand dollars of somebody's money, and each party to this suit claims it was the money of the other party. The jury said he took it from the appellant.

The defenses of the appellant are set up in three prayers, all rejected by the trial court, the only exception being to the rejection of the appellant's prayers, which are in effect as follows:

1. That the appellee failed to give eight weeks notice in writing of his intention to withdraw from the association as required by the by-laws.

2. That the secretary, Hellman, was the agent of the appellee, and not of the appellant, in the collection of dues, and that the by-laws provide for receipt of dues by the secretary at the regular meeting time and place of the association,

and that the appellee is only entitled to recover such sums as were actually received by the association, plus dividends (admitted to be $456.58).

3.  That Hellman was the agent of the appellee.

According to the evidence, two or three weeks before December 15th, 1925, and before the appellee learned of the condition of his account on the books of the association, he called the secretary, Hellman, by telephone, and said he would like to have five hundred dollars out of his funds in two or three weeks, and Hellman said "that will be all right." Article IV of the by-laws provides: "Any member wishing to withdraw from this union must give at least eight weeks written notice of his intention to withdraw. Such member withdrawing shall be paid the amount paid into the union by him, her or it, less fines, if any, and less his, her or its pro-rata share of all losses and expenses incurred by the union. * * * Members who have given notice of withdrawal shall not be entitled to vote." This article apparently contemplates the withdrawal of the member and the payment to him of all funds on deposit with the association. The appellee was not severing his connection with the association; he wanted five hundred dollars, leaving, as he thought, over $5,000 to his credit. According to the books of the association he had on each of three occasions drawn $167.85 on account. He thought they were dividends, as they each were three per cent. of the balance as it appeared on his pass book, but they were merely charges against his account on the association ledger. On another occasion the appellee was paid fifty dollars and on another one hundred and fifty dollars. These two amounts were paid by checks signed by three officers to the order of the appellee, and endorsed C. G. Juengst and Henry F. Hellman. It is evident that the endorsement of the appellee was a forgery. The president and treasurer were very accommodating and signed their names every time Hellman requested them to do so.

The appellee testified, "When I got the three checks of

$167.85 the dividend was due and I went to the association and told Mr. Hellman, the secretary, I wanted to draw the dividend, and he would write me out the check and give it to Mr. Guttman (the president) and Mr. Leimback (the treasurer), and after it was signed they handed me the check through the window. The president and treasurer were there. The dividend was due me on the full amount, over $5,596.88, which I think I had in there, that they paid dividends on. I kept the book home, and when I would go to collect these dividends I would take the book with me and they would give me the check, and I would leave my book until the following week, and I would go back for it. When I got the three dividend checks I did not have nothing to say to the president and treasurer. I just applied for a check when I went in. They saw the checks delivered to me. They were standing at the time up at their desk. They have a desk and a cage around it, and Mr. Hellman was on this side, and the president and treasurer were next, behind the cage. I would walk in and say I want the dividend, and Hellman would write out a check and they would sign it. The president and treasurer were three or four feet from Mr. Hellman, within seeing distance and hearing distance. On one occasion the treasurer was upstairs and Mr. Hellman sent the check for him to sign. The president was at his window and he signed it. He would mark it in the book, would mark it as dividends—you can see it as dividends withdrawn."

Then when he went to draw the $500 which he had requested of Mr. Hellman, Mr. Leimbach (the treasurer) said: "He (Mr. Hellman) did not notify us. He is home sick." "And I said, 'When can I get it?' and they said, 'Possibly next week,' and I said, 'All right.' I went back the following week and they told me to come about nine o'clock, that their attorney wanted to talk over the matter, and when I went back Mr. Nitzel (appellant's attorney) told me Mr. Hellman was not with them any more, and my account was only four hundred and some dollars." "He

said to me, 'Where did you give Mr. Hellman this money?' and I said, 'I gave it to him at my home,' and he said, 'You had no business to do that, you should have brought the money to the association.' I said, 'It is my money. I came here to collect this money. I want those $500. I depended on it tonight.' And he said, 'We can't let you have it,' and there was nothing else for me to do but leave there."

Under such circumstances, to have given notice of withdrawal by one who had a claim of $5,596.88, to an association which claimed that it only owed the stockholder $456.58, would have been a useless proceeding. It is a well recognized rule that a stockholder or member of a building and loan association can usually only change his status from stockholder to creditor after an expired notice. *Steinberger v. Savings Assn.*, 84 Md. 634; 9 *C. J.* 941. But if it "would be manifestly futile to make demand, none need be made." *Colton v. Drovers' Bldg. Assn.*, 90 Md. 90. The appellant admits that it owes the appellee $456.58, but denies that it owes him, either as member, stockholder, or creditor, any greater sum. The appellant was willing to pay what its ledger showed, but no greater sum. The claim of the appellee is clearly as creditor of the appellant, if Hellman, the secretary, was the agent of the appellant, and the first prayer of the appellant was properly rejected.

The appellant contends, under its second prayer, that the appellee was obliged, under its by-laws, personally to pay his dues or make deposit at certain times at the association office, and that, because they were paid to Hellman at appellee's place of business, the appellee is only entitled to recover such amounts as were actually paid in to the association plus dividends. The by-law referred to in the second prayer is, "The union meets weekly on Wednesday evenings, at such place as the board of directors may select, and the hours for receiving dues shall be from 7.30 to 9 P. M." The appellant states that it was the practice at the meetings for the secretary to stand at a counter behind a wire screen, with the president on one side and the treas-

urer on the other, and, as the dues were paid, to enter the amount on the pass book and hand the same over to the treasurer. The by-law in *Morrow v. James,* 15 Dist. Col. 61, cited by the appellant, said: "Each stockholder shall make this payment into the treasury at each and every stated meeting," and in *Killian v. Bldg. & Loan Assn.,* 21 Pa. Co. Ct. Rep. 58, 60, the court said: "Proof of such a practice must, of course, involve proof of knowledge on the part of the officers of the association that payments were being received and receipted for by the secretary, and at least a tacit assent to his doing so, as its agent." In *Endlich on Building Associations* (2nd Ed.), sec. 63, also cited by the appellant, it is said that payments "will not be valid or binding upon the association if made at another time or place and embezzled by the person to whom made unless a contrary practice has been established by the association."

It is conceded by the appellant that payments amounting to $933.83 were credited to the appellee, and the proof is that none of the deposits making up the credit were made by the appellee, but were turned in by Hellman. Hellman testified that in fifteen or sixteen years he had collected from a hundred or more on the outside. Four witnesses testified that they had always paid Hellman on the outside and that he turned in their dues. George H. Guttman, president of the association, testified that several directors collected money on the outside. He did it in one case. He said: "We did not compel the depositors to come to the building association. We were satisfied to accept money from the outside. We did not make any complaint about Hellman doing that. Hellman did it in other cases and we all knew that he brought in money from other people." Paul H. Guttman, a director, testified to the same effect.

Under these circumstances it cannot be said that the secretary, Hellman, was not authorized by the association to collect dues and accept deposits on the outside for the association. It appears to have been a common practice, and regarded as good business until Hellman appropriated the

money so paid to him. The by-laws do not prohibit the payment of dues to the secretary at other times or places than at the regular weekly meetings. *Wait v. Homestead Bldg. Assn.,* 76 W. Va. 431. After having countenanced and acquiesced in the outside collection for so long a time, the association cannot set up a by-law as an excuse or defense. "The corporation cannot set up the fraud of its own agent as a defense, because the act of its agent is its own act, and such defense would be relying on its own fraud." *Tome v. Parkersburg R. Co.,* 39 Md. 68. "Like other corporations, building associations are liable for the torts of their officers who act as agents. If agents conduct themselves fraudulently so that if they had been acting for private employers the persons for whom they were acting would have been bound by their fraud, the same rule must prevail where the principal under whom an agent acts is a building and loan association." 4 *R. C. L.* 363. "The question whether or not the fraud complained of was within the scope of the agent's authority is ordinarily for the jury." *Jones v. Sherwood Distilling Co.,* 150 Md. 32.

Because we are of the opinion that there was evidence sufficient to go to the jury to show (*a*) that the practice of making outside collections by the secretary had been recognized and acquiesced in by the association, and (*b*) that in so making such collections he was the agent of the association, the appellants' second and third prayers were properly rejected, and it was for the jury to say by their verdict whose agent he was.

*Judgment affirmed, with costs.*