POOLE ET AL. *v.* MILLER ET AL.

[No. 5, October Term, 1956.]

450

*Decided January 2, 1957.*

The cause was argued before BRUNE, C. J., COLLINS, HENDERSON and HAMMOND, JJ., and HENDERSON, J., Chief Judge of The Fourth Judicial Circuit, specially assigned.

*Karl F. Steinmann,* for appellants.

*William D. Macmillan* and *Harry E. Karr,* with whom was *William A. Fisher, Jr.,* on the brief, for appellees.

452

BRUNE, C. J., delivered the opinion of the Court.

The appeal in this case is from a decree dismissing a shareholders' suit against a building association and its president and other officers and directors. The suit involves controversies with regard to the conduct of the affairs of a building association and the rights of shareholders in its surplus.

The defendant association, The Progressive Building Association of Baltimore City (usually referred to below as "Progressive" or as the "Association") was incorporated in July, 1912, under the corporation laws of Maryland, including, of course, those provisions of the corporation laws which are contained in the sub-title headed· "Building and Homestead Associations", and deal specifically with such organizations. In the 1912 Code this sub-title of Article 23 consisted of Sections 134 to 143, inclusive; in the 1951 Code it consists of Sections 140-153, inclusive. References in· this opinion to provisions of Article 23 will be in accordance with their numbering in the 1951 Edition.

The appellants, George A. Poole and C. L. Miller, are holders of free shares in Progressive. They brought this suit on their own behalf and, allegedly, on behalf of all other shareholders of Progressive similarly situated. (No others joined them.) C. L. Miller was also a director from May, 1948 to January, 1953. A stipulation recites that C. L. Miller, his wife and two children held approximately $20,000 and Poole approximately $2,500 in Progressive. We suppose that this means the amount of their moneys on deposit with the Association. According to Progressive's practice the number of shares owned by them would be the amount of their deposits divided by the par value per share. Prior to an amendment of the charter made in October, 1954, (which was several months after this suit was filed), the par value was $104 per share; since then it is $100 per share. The appellees are the Association, its president, W. E. Miller, and other officers and directors. The bill, *inter alia,* (a) charged that *ultra vires* loans had been made, (b) asserted numerous irregularities in corporate proceedings and in the handling of loan applications, (c) charged that the president individually had made profits in transactions growing out of the Association's business in

breach of his fiduciary obligations, (d) alleged that he had received preferential treatment from the Association in several matters, and (e) claimed that the proportionate interest of the appellants in the surplus of the Association had been improperly diluted. The defendants answered and, in general, denied allegations of illegal or improper action.

The issues which the appellants raise or seek to raise are ill defined. The statement in their brief under the heading "Question Presented" that the "basic question * * * is to determine the proper construction of the Charter and the Constitution and By-Laws of Progressive and the provisions of the Homestead and Building Association sections of the General Corporation law" falls far short of meeting the requirement of Rule 39, sec. 1 (b), of our Rules Respecting Appeals (which is retained with a slight change in wording and considerably amplified in Rule 831, c. 2, of the new Maryland Rules effective January 1, 1957) that the appellant's brief shall contain a "succinct statement of the questions involved, separately numbered." Little help in defining the issues is derived from the only other statement under this heading, which enumerates sundry matters which it is said will be determined by the answer to the question above quoted. A statement of the appellants' objectives appears in their "Conclusion." These are: (1) an injunction against "the continuation of illegal and *ultra vires* acts"; (2) that Progressive be required to divest itself of mortgages said to have been illegally acquired; (3) an accounting by W. E. Miller, the President of Progressive for "profits * * * made in personal transactions while he was at the same time acting for Progressive"; (4) a further accounting from all of the directors "depending upon the outcome of the divestiture of mortgages ordered, for such losses as may have occurred during their tenure as Directors"; and (5) that after an accounting and after the establishment of a proper reserve for contingencies, the balance of the surplus of Progressive be "allocated to and appropriated to the free shareholders as they existed on the date of the filing of the Bill of Complaint in this case."

We shall turn first to charges of irregularities, rather than of *ultra vires* action, in connection with mortgages. It seems

clear that there were many irregularities in the handling of mortgage applications, such as failures to have properly signed reports of appraisal committees; but it is not shown that the Association has incurred or that it faces any losses as a result of any such irregularities. Indeed, the record discloses a loss of only $100 which was realized upon the foreclosure of mortgages during a period of several years. The appellants' effort to force the Association to divest itself of some mortgages is not based upon their alleged financial unsoundness, but upon the ground that they are not proper types of mortgages for a building association to hold or that they were unauthorized because they run for a longer period than was permitted under the Association's by-laws or for some other reason. Under these circumstances, past irregularities in the handling of mortgage applications seem immaterial insofar as the relief now sought by the appellants is concerned.

Another matter which has called forth much criticism from the appellants is the informal manner in which corporate proceedings have been conducted. The appellants assert that meetings of shareholders were not valid because a quorum was not present at such meetings, and they complain that not a sufficient number of directors were elected and that because of the small number elected, as compared with the number called for by the charter, a quorum was lacking at many meetings of directors. Since the appellants do not seek to undo any of the actions allegedly taken without due corporate form on the ground of lack of compliance with proper corporate procedure, these allegations, too, seem of little present pertinence. We may add that the appellants have not offered actual proof of the lack of a quorum at a meeting of the stockholders; and in the absence of proof to the contrary, the presence of a quorum at a stockholders' meeting will be presumed. *Baile v. Calvert College,* 47 Md. 117; *Machen, Modern Law of Corporations,* Sec. 1214. We may also note that the number of directors may be fixed by the by-laws as either a greater or a lesser number than that stated in the charter (Code, 1951, Art. 23, Sec. 49). In view of the fact above mentioned that the appellants do not seek to overturn any specific action taken by the board of directors on the ground that a quorum was not

present we need not consider what effect should be attributed to the long continued acquiescence of the shareholders in the election of a less number of directors than that stated in the charter.

We do not, however, wish to be understood as approving the loose practices as to the handling of mortgage applications and as to corporate procedure referred to above.

The appellants' complaints that the making of certain loans secured by mortgages constituted *ultra vires* transactions are based in most instances upon an alleged violation of the by-laws and in a few instances upon the nature and purpose of the loans. In every case the loan has actually been made and the appellants do not now seek to set aside or rescind the transaction. In this they recognize the established rule that an *ultra vires* transaction which has been executed on both sides will not be set aside. This matter was fully considered and disposed of in the Master's Report, chiefly on the authority of *Montrose Bldg. Ass'n v. Page,* 143 Md. 631, 123 A. 68. See also, *H. M. Brune, Jr., Maryland Corporation Law,* Rev. Ed., Sec. 56.

The appellants do, however, seek to force the Association to divest itself of allegedly illegal and *ultra vires* mortgages and to hold the individual defendants responsible for any losses which may be realized upon such divestiture.

The contention that mortgages for a longer period than eight years are *ultra vires* is based upon a by-law of the Association and the par value of its shares. The by-law calls for payments of twenty-five cents a week per share, and the par value was $104 per share. Arithmetically, it requires payments of twenty-five cents a week over a period of approximately eight years to reach a total of $104. The by-law provision in question is authorized under Code (1951), Art. 23, Sec. 140 (b).

The evidence shows that it was a matter of business necessity, in order to meet competition, to make loans in excess of eight years and that it was impossible to obtain 6% interest on loans which did not exceed that period, and there is no showing of any loss to the Association by making loans for more than eight years. Without accepting the appellants'

contention, we are of the opinion that if the by-law did limit the duration of loans to eight years, it had been waived 'or repealed by acquiescence. *Machen, Corporations,* Vol. I, Secs. 727-728 states:

"*Repeals by Desuetude.*—We have seen above that custom may have the force of a by-law; and a necessary corollary of that proposition is that a similar custom may also repeal a by-law. Consequently, long-continued disregard of the provisions of a by-law may be equivalent to an express repeal. Even a by-law which has been formally adopted may lapse or be repealed by desuetude."

"Sec. 728. *Disregard of By-laws without formal Repeal.*—By-laws may in any individual case be disregarded by the same authority by which they might be formally repealed."

See also, 8 *Fletcher, Corporations,* Perm. Ed., Sec. 4200 and 1954 Supp. thereto; *Patterson Park Perm. Bldg. Union No. 3 v. Juengst,* 153 Md. 36, 137 A. 498.

In addition, insofar as C. L. Miller is concerned, his active participation in the making of many such loans would seem to bar any complaint on his part. *Kraft v. Highland Perm. Bldg. Ass'n,* 165 Md. 570, 169 A. 71. See also, *Matthews v. Headley Chocolate Co.,* 130 Md. 523, 100 A. 645.

Beyond all of the above considerations is the further fact that the by-laws were amended in October, 1954, so as to permit loans for a longer period than eight years. It would seem a vain act at best to require the Association now to divest itself of mortgages which it could at once reacquire. This amendment occurred before the decree was entered in this case. As is said in 19 *Am. Jur. Equity,* Sec. 411, "While equitable jurisdiction is to be determined with reference to the situation existing at the time when the bill is filed, the relief to be accorded by the decree is governed by the conditions which are shown to exist at the time of making thereof, and not by the circumstances attending the inception of the litigation." See *Randel v. Brown,* 2 How. (U. S.) 406; *Stonega Coke & Coal Co. v. Price* (C. C. A. 4th), 106 'F. 2d

411, cert. den., 308 U. S. 618; *United Corp. v. Federal Trade Comm.* (C. C. A. 4th), 110 F. 2d 473. A similar rule is applied in cases where a court will not decree specific performance of a contract under which the defendant has an option to terminate the contract and so might render the decree of no effect. *Pomeroy, Equity Jurisprudence*, 5th Ed., Sec. 1405 b. Like reasoning underlies the refusal of courts to decide moot questions. Indeed, by reason of the amendment, this question may be described as moot.

The appellants' other contentions that certain loans are *ultra vires* transactions rest principally upon the ground that a building association can make loans only to finance the purchase of homes and may not make loans for commercial purposes. Undoubtedly, the general purposes of building associations are to promote thrift and to facilitate the building or purchase of homes, or both; but the Maryland statutes do not limit them to making loans for such purposes. Moreover, it is clear that under Code (1951), Art. 23, Sec. 145, a building association may invest in mortgages on real or leasehold estate situated in this State. Though exemption from taxation granted to building associations under Code (1951), Art. 81, Sec. 8 (16), which prior to 1929 was contained in what is now Sec. 145 of Article 23, is doubtless intended to promote thrift and home ownership, it may be noted that prior to the passage of Chapter 226 of the Acts of 1929 (Sec. 5, pp. 719-720), Sec. 145 (then 165) of Article 23 expressly exempted from taxation shares of building associations to the extent that they represented (*inter alia*) investments in mortgages, "whether said mortgages be building association mortgages or ordinary mortgages." Sec. 8 (16) of Article 81 uses the term "mortgages on real estate, situated in this State", without any expressed restriction that it shall apply only to mortgages of the building association type; and we find no indication of any intent so to limit it. (Under Sec. 2 (12) of Article 81, the term real estate includes leaseholds, unless such a construction would be unreasonable.)

It is clear, we think, that at all times material to this suit, Progressive had sufficient surplus to make the mortgage loans which were wholly or partially commercial, without using

capital represented by the par value of its shares to make such loans. We cannot say that the existing statutes regulating such associations prohibit a building association from investing its surplus in such mortgages; indeed they appear to be within the authorization of Section 145. We do not mean to imply that a different rule would be applicable if there were no surplus, but find it unnecessary to express an opinion with regard to that matter.

We note, however, that the document entitled the "Constitution and By-Laws" of Progressive provided by Article VIII, Sec. 12 that "Should there at any time be money on hand that cannot be disposed of by redemption of shares in the regular manner, the Board of Directors, by written consent of all the members of the entire Board, may make any other investment advantageous to the Association." It is clear that C. L. Miller, while and as a director, objected to the Farace loan, which was partly—we think predominantly— commercial in character. The above quoted passage, if applicable, prohibited the making of a loan without the unanimous written consent of the directors, and the consent of two directors was lacking. The amendments of the by-laws effected on October 11, 1954, seem to place this matter in substantially the same position as loans for longer periods than eight years. Loans such as the Farace loan and the loan on an automobile sales and service property, which was wholly commercial in character, are permissible under the present by-laws, and no useful purpose would be served by requiring the Association to divest itself of mortgages which it could at once reacquire.

The appellants strongly attack the practice under which W. E. Miller took ground rents and the Association took mortgages on the leasehold interests in the same properties. Usually, existing ground rents were replaced by newly created ones with W. E. Miller as the lessor, and the amounts of the new rents did not exceed the old. There was one exception, which seems to have been reasonably explained as to its business basis. The possibilities of abuse in such a practice require no elaboration, but the evidence does not support an inference that the Association has thereby suffered loss or that

W. E. Miller has profited at the expense of the Association. There was testimony to show that the Association did not wish to buy ground rents, and it appears to have been the established policy of Progressive to lend on the security of mortgages on leasehold, rather than fee simple property. The question was considered at length by the Master and his Report, which was approved by the Court, states: "In my opinion there is a clear inference that it was the policy of the Building Association not to engage in the purchase of ground rents, that there was no real conflict between the interests in this respect of the Association and Mr. Miller, and that the directors consistently acquiesced in this procedure." There are several Maryland cases involving business transactions in which a corporate officer or director had a personal interest affecting property or some other matter in which his corporation was interested. Perhaps the closest of these to the instant case is *American Piano Co. v. Knabe,* 131 Md. 111, 101 A. 680, in which officers and directors of the plaintiff corporation owned the fee of property leased to the corporation and sold the reversion to a third party for $85,000 and an agreement on the part of the purchasers to pay the sellers $1,000 a year from any rent received from the property. The corporation sued its officers and directors for an accounting of the rent received by them. This Court upheld the position of the defendants and emphasized the point that the rent charged was not excessive. The Court said (131 Md. at 115): "As the owners of the reversion in the leased property the Messrs. Knabe held an interest which was distinct from that of the lessee corporation, and which they had an undoubted right to sell and convey." See also *Citizens' Trust Co. v. Tompkins,* 97 Md. 182, 54 A. 617, and *Diedrick v. Helm* (Minn.), 14 N. W. 2d 913, 153 A. L. R. 649, which shows the difficulty of laying down an absolutely hard and fast rule applicable to all cases and a note in 64 *A. L. R.* 782, where, at page 784, it is said that: "Generally, it is held that the directors or officers of a corporation are not, by reason of the fiduciary relationship they bear towards the corporation and the stockholders thereof, precluded from entering into and engaging in a business enterprise independent from, though similar to, that

conducted by the corporation itself, provided that in doing so they act in good faith and do not interfere with the business enjoyed by the corporation."

In connection with this phase of the case it may be interesting to note that Sec. 145 of Article 23 of the Code was amended by Chapter 132 of the Acts of 1943 to permit building associations to invest in ground rents, so that a policy of not doing so may find some historical support, though there is certainly no longer any statutory prohibition. Since a ground rent does not require the payment of a redemption price and accordingly can have no maturity date for the payment of principal, it is not so well adapted as a mortgage providing for amortization payments as security for a building association loan made to finance the purchase of a home.

In our opinion, on the facts of this case, the appellants have not shown an abuse of his fiduciary position which would require W. E. Miller to account to Progressive for income which he has derived from ground rents on properties where Progressive held a mortgage on the leasehold and there is no proof that he has derived any other profit from these ground rents through sales or otherwise.

The appellants also make complaints with regard to Progressive's surplus. They charge that W. E. Miller was permitted to make deposits in the Association for the benefit of members of his family at times when others were not permitted to do so and that this enabled them to obtain an interest in the surplus, to which they were not entitled. There are also complaints that at times others were permitted to acquire interests in surplus through becoming shareholders or depositors at the expense of existing shareholders through dilution of their interest in the surplus.

We shall take up the latter complaint first. The appellants rely heavily upon Section 142 of Article 23, which permits building associations to charge new shareholders or depositors a bonus or assessment upon their becoming such, in order to place them on an equal footing with existing shareholders. This Section is permissive, not mandatory; and there was nothing in Progressive's charter or by-laws (except possibly the fifty cents per share admission charge mentioned below)

which undertook to exercise this permissive power. The practice of the Association was not to impose any such charge. The record is simply blank as to what the situation was when the appellants became shareholders. It is quite conceivable that they were beneficiaries of the practice of which they now complain, but there is no actual proof of this one way or the other.

There was a provision in the "Constitution and By-Laws" of Progressive prior to October 11, 1954, for an admission charge of fifty cents per share to be assessed. against persons becoming members. This was a fixed amount. It did not depend upon, nor was it varied to accord with, the book value of the shares. As a matter of fact, Progressive, at least in recent years, did not actually impose the charge at all because of competitive reasons. This was another corporate irregularity which is covered by what we have already said with regard to the waiver of other by-law provisions. Also, C. L. Miller apparently acquiesced in this practice while he was a director.

The appellants rely upon the doctrine of pre-emptive rights, which is recognized as a part of the corporation law of Maryland. Code (1951), Art. 23, Sec. 26, *Ross Transport, Inc. v. Crothers,* 185 Md. 573, 45 A. 2d 267, and cases therein cited. There is no express provision in Progressive's charter dealing with the subject, and the appellees claim that under paragraph (b) of Section 26, *supra,* no such rights exist because it would be impracticable to apply them. We think that there is a good deal of force to this contention. As we understand the operations of a building association, it must have some funds on hand to meet the borrowing needs of its members. Some of the money comes from the weekly payments made under existing loans; but without some free share capital, a building association would be severely handicapped and its business would tend to dry up. If it wishes to grow and prosper, it must ordinarily be able to attract some new capital. New funds cannot be brought in without having an effect upon the amount of the surplus applicable to each share unless there are frequent—perhaps daily—calculations reflecting the financial condition of the association and the value (book or actual) of its shares, and a premium based thereon is charged for new

shares. If book value were always true value, this might not be a difficult calculation; but such calculations seem better adapted to the operations of mutual investment trusts than to those of a small building association, such as Progressive. From this point of view, even the maintenance of exact pro rata asset value seems difficult, and the almost constant issuance of "rights", as a means of according pre-emptive rights, seems impracticable.

In addition, and we find this at least equally important, Section 144 seems to recognize that pre-emptive rights are not strictly applicable to shares of building associations. Most of the modern pre-emptive rights cases emphasize the importance of maintaining relative voting rights even more than maintaining relative asset ownership as the basis for pre-emptive rights. Obviously Section 144 does not. It seems to negate the applicability of pre-emptive rights. It simply authorizes the charging of a premium to new subscribers. It does not require that shares first be offered to existing shareholders, nor does it attempt to preserve the relative voting rights of existing shareholders even if a premium is charged against a newcomer as the price of admission.

For the reasons just stated we find nothing improper in the Association's acceptance of new free share money from the public, without charging a premium and without first offering shares to existing shareholders.

As to free shares issued to members of W. E. Miller's family, the record is obscure as to the actual amounts involved and the nature of the transactions, and there is no proof of any loss. How much of such accounts represented new money and how much transfers from existing accounts of W. E. Miller is not clear, but it seems that the net amount of new money was relatively small, and that W. E. Miller had investments in contemplation for the prompt use of such funds. The Master found that favoritism had been practiced in accepting deposits from them when deposits were not being accepted from others, and properly condemned this action. We think, however, as did the Master and the trial Judge, that not enough was shown to require an accounting or to warrant more drastic relief.

The appellants also complain of the waiver of about three months' interest, amounting to $150, on a mortgage on a number of garages owned by W. E. Miller. The waiver was granted in connection with the prepayment of the principal made at a time when the value of the garages seems to have been doubtful. We think that bad faith on the part of the other directors was not shown, and the transaction as a whole may well have been beneficial to the Association.

Still another matter of which the appellants complain is the payment by the Association of a counsel fee for W. E. Miller's counsel in a mandamus suit in the Superior Court of Baltimore City. The record in that case was not offered in the trial court in this case and is not before us. Only rather sketchy information with regard to that suit is contained in the present record. The Superior Court case was apparently brought by shareholders of Progressive to require the disclosure of some information—just what does not appear. W. E. Miller was apparently sued as an officer of Progressive and the case was decided adversely to him. Section 60 (a) of Article 23 of the Code (1951) permits a corporation to indemnify any person for expenses of litigation brought against him by reason of his being or having been an officer or director "except in relation to matters as to which such person is adjudged in such action, suit or proceedings to be liable for negligence or misconduct in the performance of duty." The meagre statements in the record about the mandamus suit do not even suggest negligence on the part of W. E. Miller and are not sufficient to prove "misconduct" as distinguished from what may have been a mere error as to the existence or extent of a shareholder's right to an inspection of corporate records.

One of the main objectives of the appellants appears to be to bring about a present or, at least, an early distribution of the surplus of Progressive. They complain that over a period of several years their proportionate interest in surplus has declined. The book value per share on January 1, 1949, was approximately $163 per share; on January 1, 1955, it was only $138 per share. The aggregate amount of surplus, distribut-

able over a larger number of shares, had, however, increased from $140,000 to $161,000, in round figures; and regular dividends of 4% were paid in each year from 1949 through 1955, with extra dividends of 2-1/2% each in 1953 and 1954 and of 1% in 1955. As we have already said, a building association must have some money available to make loans; otherwise, it cannot meet the needs of its members and its business will dry up. This is simply another aspect of the subject which we have already discussed with regard to pre-emptive rights.

So far as we can discover, although it would have been possible to provide otherwise under Section 144 of Article 23, no actual provision was made prior to October 11, 1954, for paying to a shareholder withdrawing from Progressive any portion of the surplus other than dividends accrued or declared and unpaid up to the time of withdrawal.

Under the by-laws adopted on October 11, 1954, it is possible for the Association under some circumstances to redeem shares at what the Board of Directors may determine to be their "full value," and this may exceed the so-called "withdrawal value." The latter is defined as "the aggregate of payments upon such [a member's] share account, and dividends credited thereto, less redemption and repurchase payments." The "withdrawal value" is all that a withdrawing shareholder may *require* to be paid to him. We find nothing in Section 144 which would invalidate such a by-law.

We have endeavored to consider all of the somewhat scattered attacks to be found in the appellants' brief and believe that we have disposed of all of them which call for specific mention.

Though the past practices of this Association are replete with irregularities, we are of the opinion that the appellants have not shown that they are entitled to the relief which they seek. On the other hand, we think that because of these practices the Association and W. E. Miller, its President and the dominant influence in its affairs, should bear a part of the costs of these proceedings. Accordingly, the decree dismissing the bill will be affirmed, the costs of this appeal to be

paid one-half by the appellants, one-fourth by W. E. Miller and one-fourth by the Association.

> *Decree affirmed; the costs of this appeal to be paid one-half by the appellants, one-fourth by W. E. Miller and one-fourth by the Progressive Building Association of Baltimore City.*